```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
CARLOS ARRIAGA

        Plaintiff,                      MEMORANDUM AND ORDER

    -against-                           Civil Action No.
                                        CV-03-2906 (DGT)
JIM WALSH

        Defendant.

--------------------------------X
```

TRAGER, District Judge

Petitioner, Carlos Arriaga, filed the above captioned case pro se on May 29, 2003 in the United States District Court, Southern District of New York. By order dated June 9, 2003, the petition was transferred to this Court. Carlos Arriaga seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254 for an alleged constitutional violation stemming from his state court convictions for murder and criminal possession of a weapon. For the reasons stated below, this petition is denied.

**Background**

(1)

Carlos Arriaga pleaded guilty to the February 6, 1999 murder of Jose del Carmen Feliz, a livery cab driver based out of Williamsburg, Brooklyn. The factual background that follows relies on the trial court's opinion rendered on November 5, 2000 at the close of its suppression hearing.

Carlos Arriaga spent the early morning hours prior to the

murder at a local bar drinking and playing pool with his siblings, Steven and Linda Arriaga, and his friend Obrayan Dones. During the course of the evening petitioner, Steven Arriaga and Obrayan Dones decided to rob a livery cab driver.

To that end, the group left the bar at around 7:30 a.m. and walked to the base of a local car service company. They requested a car from the dispatcher, Francisco Gonzalez, who directed them to Feliz' car parked out front. The four entered the car and first directed the driver to petitioner's sister's house. After dropping off their sister, the Arriaga brothers and Dones instructed Feliz to take them to another bar on the corner of North 3rd and Berry Streets. Just as the car approached the location, Carlos Arriaga pulled out a revolver and shot Feliz in the back of the head.

The car crashed and the Arriaga brothers and Dones fled the scene. They ran from the car to their friend Vincent Vazquez' house, where they showered and threw away their bloodstained clothes.

(2)

The police began its investigation the afternoon of the murder by canvassing the neighborhood for witnesses. The police began to focus on the Arriaga brothers after an anonymous informant, who had heard that a woman and two younger men who appeared to be twins had been at a bar the night before, provided

2

the investigating officers with their first names and address.

The informant's tip was corroborated later that morning when the investigating officers visited the livery car company that had employed Feliz. Francisco Gonzalez, the dispatcher, told the police that two Hispanic males, who appeared to be twins, had come to the company's base with a Hispanic female to get a car around 7:25 that morning. The dispatcher later identified Carlos Arriaga in a photo array. (Hr'g Tr. at 67.)

Based on this information, at 2:15 a.m. the day after the murder, six detectives and a sergeant surrounded the Arriaga's building to effect an arrest. Id. The officers, who proceeded without a warrant, found Carlos Arriaga at home and willing to accompany them to the precinct. Id.

At the station house, a detective told Arriaga that the police were investigating something that had occurred the previous morning on Berry Street and then read Arriaga his Miranda rights. After Carlos Arriaga read and signed the Miranda card, waiving his rights, the detective told him that he had reason to believe that he had been in the car when Feliz had been shot. Id. Carlos Arriaga admitted to the detective in a signed statement that he and his brother indeed had been in the cab. He then incriminated Obrayan Dones as the shooter.

Carlos Arriaga then accompanied three detectives[1] and a

---

[1] A fourth detective later joined them.

sergeant to the house where Steven Arriaga was staying with his girlfriend's family. Although numerous discrepancies arose concerning the precise facts underlying the police's entry and search of the apartment, the trial court issued findings of fact during a joint suppression hearing that revealed the following: (1) the police entered the apartment without consent; (2) the police then entered the room where Steven Arriaga was sleeping with guns drawn and pointed; (3) they arrested Steven Arriaga; (4) the police handcuffed Steven Arriaga and took him out of the apartment with pants and shoes, but no shirt. (Hr'g Tr. at 68-71.)

Steven Arriaga arrived at the precinct at around five o'clock in the morning. (Hr'g Tr. at 72.) Before divulging any information, Steven Arriaga read and signed his Miranda form. He then proceeded to tell Detective Goggin a story consistent with the one his brother, the petitioner, had given the police hours earlier: Steven Arriaga was in a cab with his brother when Obrayan Dones shot the driver. Steven Arriaga committed this statement to writing at around 6:30 a.m. and then three hours later, in the presence of an Assistant District Attorney, he videotaped an interview containing for the most part, the same information. (Hr'g Tr. at 72-74.)

When the Assistant District Attorney finished interviewing Steven Arriaga, he then interviewed Carlos Arriaga. At about ten

o'clock, Carlos Arriaga waived his Miranda rights a second time and voluntarily spoke to the police on video, reiterating his initial statement incriminating Obrayan Dones. (Hr'g Tr. at 75.)

At about the same time, however, Vincent Vazquez told the police a story that contradicted the Arriaga brothers' version of the murder in one crucial detail: according to Vincent Vazquez, Carlos Arriaga shot Feliz. (Hr'g Tr. at 76.) Although Vincent Vazquez had not been in the car to witness the murder, he claimed that Carlos Arriaga admitted to him just after the murder that he had killed Feliz. Id. Vazquez further helped the police by leading them to a garbage can to recover the Arriagas' bloodstained clothing. (Hr'g Tr. at 74-75.)

Armed with this discrepancy, Detective Goggin again spoke to Steven Arriaga at around 11:40 a.m. This time, however, the detective confronted Steven Arriaga with Vincent Vazquez' statement incriminating Carlos Arriaga. Id. Upon learning Vazquez' version of the story, Steven Arriaga changed his story. Id. At this point, Steven Arriaga incriminated his brother as the sole murderer. Id. However, Steven Arriaga claimed that his brother had not intended to shoot the driver; the gun fired accidentally as the cab driver caught sight of the gun and suddenly accelerated. Id.

On the basis of this new information, Detective Carmosin interviewed Carlos Arriaga again around noon. Id. Once

petitioner learned that his brother and Vazquez had informed on him, he acknowledged that he shot Feliz. (Hr'g Tr. at 77.) Carlos Arriaga, however, also told the police the gun fired accidentally as the cab sped up. Id. Carlos Arriaga wrote and signed a statement containing the new information around 1:15 p.m. Id. Both brothers were reinterviewed on video by the Assistant District Attorney after they ate lunch, giving accounts consistent with their second written statements. (Hr'g Tr. at 77-78.)[2]

Carlos Arriaga was charged with two counts of Murder in the First Degree (N.Y. Penal Law § 125.27 [1][a][vii]), three counts of Murder in the Second Degree (N.Y. Penal Law § 125.25 [1], [2], [3]), three counts of Attempted Robbery in the First Degree (N.Y. Penal Law § 100.00/160.15 [1], [2], [4]), one count of Criminal Possession of a Weapon in the Second Degree (N.Y. Penal Law § 265.03), one count of Criminal Possession of a Weapon in the Third Degree (N.Y. Penal Law § 265.02 [4]), and one count of Attempted Robbery in the Second Degree (N.Y. Penal Law § 110.00/160.10 [1]).

---

[2] The trial court judge noted that Steven Arriaga seemed more subdued in this videotape than the previous, but that he appeared "awake, alert and responsive" nonetheless. (Hr'g Tr. at 78.) The trial court further noted that Steven wiped his nose during the interview, but that "no blood appeared on the tissue." Id.

(3)

Prior to their trial, which was initially scheduled as a joint trial, Carlos and Steven Arriaga made a motion to suppress the evidence obtained from their allegedly illegal arrests as fruit of the poisonous tree.[3]  Carlos Arriaga argued that his statements while in police custody should be suppressed because they were obtained as a result of his and his brother's illegal arrests.  Specifically, at issue were three of petitioner's statements: (1) his first oral and written statement to the police accusing Obrayan Dones of murder; (2) his first video statement and; (3) his oral, written and video statements containing his confession to the murder.  The statements roughly fall into two categories:  the statement Carlos Arriaga gave before his brother and Vincent Vazquez spoke to the police and those statements Carlos Arriaga made after their arrest.

As an initial matter, the trial court held that Carlos Arriaga's arrest had been illegally executed without probable cause.  The court based its decision on a general lack of police credibility at the suppression hearing as well as the time of the arrest and the large number people employed to effect the arrest.

---

[3]This discussion focuses on the evidence at the suppression hearing that is relevant to the argument Carlos Arriaga raises on habeas review, namely whether the trial court erred in admitting into evidence several of his in-custody statements. However, to the extent that his argument involves statements made by his brother and Vincent Vazquez, they too will be addressed.

(Hr'g Tr. at 80-81.)

Next, the trial court also concluded that (1) Steven Arriaga had standing to challenge his arrest and (2) his arrest had been illegally executed largely because it was conducted both without a warrant and without consent to enter the apartment. (Hr'g Tr. at 82.)

After a lengthy hearing with multiple witnesses, the trial court ultimately suppressed Carlos Arriaga's initial oral and written statement to the police as fruit of an illegal arrest. The remainder of Carlos Arriaga's statements, however, were not suppressed.[4] The trial court held that all but the first of petitioner's statements were sufficiently attenuated from his illegal arrest. In particular, the court found that Steven Arriaga's initial statement attenuated his brother's illegal arrest from his subsequent statements; by incriminating his brother in an attempted robbery, Steven Arriaga's initial statement provided the police with intervening probable cause to arrest Carlos Arriaga. Additionally, the court gave weight to the significant amount of time separating the illegal arrest from petitioner's later statements and the new Miranda warnings which

---

[4]Although Carlos Arriaga's first videotaped statement at ten a.m. was admitted, the trial court ordered that all references to his earlier suppressed statement should be removed from the video statement.

8

preceded them.[5]

(4)

At the end of the suppression hearing, the trial court granted a motion to sever the trials of Carlos and Steven Arriaga. The court scheduled Carlos Arriaga's trial to begin later that day, January 5, 2000. A week later, on January 12, 2000, Carlos Arriaga pleaded guilty to murder in the first degree and criminal possession of a weapon in the second degree. In doing so, he accepted an indeterminate sentence of 25 years to life.

As part of his plea agreement, Carlos Arriaga waived many rights, including his right to appeal from his judgment of conviction. (Hr'g Tr. at 389-90.) The trial court explained to Carlos Arriaga in very explicit terms that in waiving his right to appeal, he also waived his right to challenge the trial court's decision in the suppression hearing. (Hr'g Tr. at 390.) Carlos Arriaga represented to the court that he understood this consequence of his plea.

Additionally, the trial court took care to assure itself that Carlos Arriaga's plea was informed and voluntarily. The court verified that Carlos Arriaga had conferred with his lawyer and family members before pleading guilty, that he had received

---

[5]The court further held that there was no evidence that Steven Arriaga's statement was coerced. (Hr'g Tr. at 89-90.)

no promises in exchange for his guilty plea other than the trial court's sentencing promise and that he was pleading guilty voluntarily and of his own free will. Petitioner unambiguously answered the trial court's queries in the affirmative.

Notwithstanding Carlos Arriaga's agreement to waive his right to appeal, he perfected an appeal to the New York Supreme Court, Appellate Division, Second Department (or "Appellate Division"), challenging the pre-trial suppression hearing. The Appellate Division unanimously affirmed Carlos Arriaga's conviction on May 20, 2002, stating that appellate review was precluded when petitioner waived his right to appeal, People v. Arriaga, 294 A.D.2d. 511, 742 N.Y.S.2d 851 (2d Dep't 2002), and on August 29, 2002, the New York Court of Appeals denied leave to appeal on August 29, 2002. People v. Arriaga, 98 N.Y.2d 708, 749 N.Y.S.2d 5 (2002).

**Discussion**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (or "AEDPA"), a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim either "resulted in a decision that was contrary to, or involved an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States or resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254 (d).

Carlos Arriaga brings this § 2254 petition pro se based on the state's alleged violation of his Fourth Amendment right to be free from unreasonable search and seizure. Carlos Arriaga does not claim that the trial court reached a decision that was contrary to, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court of the United States or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Id.

Instead of making such a claim, petitioner alleges that the trial court erred when it failed to exclude his precinct house statements from evidence because they were obtained as a direct result of an illegal arrest. Contrary to the trial court's decision, petitioner urges that the statements were not attenuated from his illegal arrest because the only intervening evidence was statements from his brother, Steven Arriaga, and Vincent Vazquez. He argues these statements were obtained as a direct result of petitioner's arrest and under highly coercive circumstances.

The state appeals court did not address these issues because petitioner waived his right to appeal including the state court's decision regarding these evidentiary issues. People v. Arriaga,

11

294 A.D.2d. 511, 742 N.Y.S.2d 851 (2d Dep't 2002); People v. Arriaga, 98 N.Y.2d 708, 749 N.Y.S.2d 5 (2002). Federal habeas relief is not available when a claim was denied in state court on an independent and adequate state ground. Coleman v. Thompson, 501 U.S. 722, 749-50; 111 S.Ct. 2545, 115 L.Ed.2d 640 (1991). Dismissal due to a state procedural bar, including a plea agreement not to appeal, constitutes an independent and adequate state ground. Acosta v. Giambruno, 326 F.Supp.2d 513, 522 (S.D.N.Y. 2004); Smoot v. McGinnis, 98-cv-4145, 2001 WL 1328593, at *4 (E.D.N.Y. Sept. 20, 2001). In this case, the state court based its entire ruling on the waiver of appeal. People v. Arriaga, 294 A.D.2d. 511, 742 N.Y.S.2d 851 (2d Dep't 2002). Therefore, petitioner's habeas petition is denied.

Even if petitioner's claim were not procedurally barred by his guilty plea, his case would be denied on the merits. Petitioner has not argued that his statements were the result of coercion, giving rise to a Fifth Amendment due process claim. Arizona v. Fulminante, 499 U.S. 279 (1990). It is clear from the record that his statements were voluntary. There are also no allegations of coercion of his co-defendant brother.[6]

---

[6] The trial court noted that Steven Arriaga appeared relaxed and occasionally smiled during the interview. (Hr'g Tr. at 73.) The trial court further observed that Steven Arriaga had something to drink during the interview. Id.

12

Insofar as petitioner's claims are based on the Fourth

Amendment, they are precluded under the well-established rule in Stone v. Powell, 428 U.S. 465 (1976). A federal habeas court is barred from reviewing Fourth Amendment claims so long as the state has provided petitioner with the opportunity for a full and fair litigation of his claim. Id.; see also Grey v. Hoke, 933 F.2d 117, 121 (2d Cir. 1991); McPhail v. Warden, Attica Correctional Facility, 707 F.2d 67 (2d Cir. 1983). The Supreme Court reasoned in Stone that the exclusionary rule, which provides the foundation of petitioner's argument, "is not a personal constitutional right," but rather a "'judicially created structural remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect.'" Stone, 428 U.S. at 486 (quoting United States v. Calandra, 414 U.S. 338, 348 (1974)). The exclusionary rule's deterrent value, however, is too greatly reduced on habeas review to justify the rule's cost to society, namely the exclusion of highly reliable evidence. Id. at 486-7, 492-95.

New York State provides the opportunity for a full and fair litigation of a party's claims through New York Criminal Procedure Law § 710. Jackson v. Scully, 781 F.2d 291, 297 (2d Cir. 1982); Gates v. Henderson, 568 F.2d 830, 837 (2d Cir. 1977). "The focus of this standard is on the word 'opportunity,' and Gates means only that the state must make available 'a statutory mechanism' for suppression of evidence tainted by an unlawful

search or seizure." <u>McPhail</u>, 707 F.2d at 69 (quoting <u>Gates</u>, <u>supra</u>, 568 F.2d 830). Indeed, even a litigant who does not employ New York Criminal Procedure Law § 710 to challenge an alleged violation of the Fourth Amendment is barred from raising the claim in a habeas petition. <u>Id.</u> (denying habeas review to petitioner who did not seek to suppress his statements to police until the state <u>coram nobis</u> proceeding.)

Exception to the rule articulated in <u>Stone</u>, <u>supra</u>, may arise where the defendant is precluded from utilizing a state's procedural mechanism "by reason of unconscionable breakdown in the underlying process." <u>Gates v. Henderson</u>, 568 F.2d at 840 (citing <u>Frank v. Manqum</u>, 237 U.S. 309 (1915)); <u>Capellan v. Riley</u>, 975 F.2d 67, 70 (2d Cir. 1992). In the instant case, Carlos Arriaga does not suggest that New York State does not provide an opportunity to fully and fairly litigate his Fourth Amendment claim or allege a breakdown in the underlying process. Consequently, Carlos Arriaga's petition is denied.

## Conclusion

For these reasons, petitioner's application for a writ of habeas corpus is dismissed. Further, as the petition presents no questions of substance for appellate review, a certificate of appealability is denied. The Clerk of Court is directed to enter judgment and close the case.

Dated: Brooklyn, New York
       December 27, 2005

                                    SO ORDERED:

                                    _/s/_____
                                    David G. Trager
                                    United States District Judge